1 JOSE ANTHONY BORJA
CDCR # T-54311
2 P.O. Box 8504
Coalinga, CA 93210
3
In Pro Se
4

FILED
CLERK, U.S. DISTRICT COURT

APR 1 0 2009

CENTRAL DISTRICT OF CALIFORNIA
BY                    DEPUTY

8          IN THE UNITED STATES DISTRICT COURT

9        FOR THE CENTRAL DISTRICT OF CALIFORNIA

10

11  **JOSE ANTHONY BORJA,**                    No. CV 09-2420 DDP (SS)

12                              Petitioner,

13        **v.**

14  **MATTHEW CATE, Secretary of the CDCR,**

15                              Respondent.

16

17       MEMORANDUM OF POINTS AND AUTHORITIES

18          IN SUPPORT OF PETITION FOR

19          WRIT OF HABEAS CORPUS

20               (28 U.S.C. § 2254)

21

22

23

24

25

26

27

28

1

## TABLE OF CONTENTS

2
                                                                              Page

3   MEMORANDUM OF POINTS AND AUTHORITIES...............................1

4   INTRODUCTION......................................................1

5   STATEMENT OF THE CASE............................................2

6   STATEMENT OF THE FACTS..........................................4

7       I. The Allegations Of Attempted Murder......................4
           A. Prosecution Case......................................4
8          B. Defense Case..........................................4

9       II. The Allegations Of Assault.............................5
            A. Prosecution Case.....................................5
10          B. Defense Case.........................................7

11      III. The Gang Enhancement Allegations.......................8
             A. Prosecution Case....................................8
12           B. Defense Case........................................9

13  STANDARD OF REVIEW..............................................11

14  ARGUMENT.......................................................13

15  I.    The State Court Unreasonably Applied U.S. Supreme
          Court Authority In Its Opinion That It Was Not
16        Prejudicial Constitutional Error For A Gang Expert
          To Testify That He Believed Petitioner Was Guilty
17        Of All Gang Enhancement Allegations.......................13

18        A. Summary of the Argument...............................13
          B. Governing Legal Standards.............................13
19        C. The Gang Expert Testimony Prejudicially
             Violated Petitioner's Fourteenth Amendment Rights
20           Under U.S. Supreme Court Authority.....................14
                1. The Gang Expert's Testimony On Petitioner's
21                 Guilt Violated Petitioner's Fourteenth
                   Amendment Rights.................................14
22              2. The Gang Expert's Testimony Had A Substantial
                   And Injurious Influence On The Jury's Verdict.....16
23        D. The State Court's Opinion Was Unreasonable.............17

24  II.   The State Court Unreasonably Applied U.S. Supreme
          Court Authority In Its Opinion That There Was
25        Sufficient Evidence To Find That Petitioner's
          Conduct Satisfied The Gang Enhancement Requirements.......18
26
          A. Summary of the Argument...............................18
27        B. Governing Legal Standards.............................18
          C. There Was Insufficient Evidence That Petitioner's
28           Conduct Met The Gang Enhancement Requirements..........19

<u>TABLE OF CONTENTS (cont.)</u>

Page

D. The State Court Unreasonably Applied <u>Jackson v.
Virginia</u>.................................................20

III. **The State Court Unreasonably Applied U.S. Supreme
Court Authority In Its Opinion That There Was
Sufficient Evidence That Petitioner Was Aware Of The
Existence Of The Bautistas When He Shot Carlos Andrade.....22**

A. Summary of the Argument...............................22
B. Governing Legal Standards............................22
C. There Was Insufficient Evidence That Petitioner Was
Aware Of The Bautistas When He Shot Carlos Andrade......23
D. The State Court Unreasonably Applied <u>Jackson v.
Virginia</u>.............................................23

**CONCLUSION**...............................................24

**VERIFICATION**............................................25

1

<u>TABLE OF AUTHORITIES</u>

2

Page(s)

3

**Federal Cases**

4

<u>Bell v. Cone</u>
535 U.S. 685 (2002)........................................12

5

<u>Brecht v. Abrahamson</u>
507 U.S. 619 (1993)........................................16

6

7

<u>Garcia v. Carey</u>
395 F.3d 1099 (9th Cir. 2005)..........................19, 20

8

<u>Jackson v. Virginia</u>
443 U.S. 307 (1979)..........................18, 19, 20, 22, 23

9

10

<u>Smith v. Mitchell</u>
437 F.3d 884 (9th Cir. 2006)...............................19

11

<u>Ulster County Court v. Allen</u>
442 U.S. 140 (1979)......................................13, 15

12

13

<u>United States v. Gaudin</u>
315 U.S. 506 (1995).................................13, 14, 15

14

<u>Williams v. Taylor</u>
529 U.S. 362 (2000)........................................12

15

16

<u>Woodford v. Garceau</u>
538 U.S. 202 (2003)........................................11

17

<u>Yarborough v. Alvarado</u>
541 U.S. 652 (2004)........................................12

18

19

**State Cases**

20

<u>In re Frank S.</u>
141 Cal.App.4th 1192 (2006)...............................14

21

<u>People v. Gardeley</u>
14 Cal.4th 605 (1996)......................................17

22

23

<u>People v. Killebrew</u>
103 Cal.App.4th 644 (2002)..............................14, 15

24

<u>People v. Rivas</u>
112 Cal.App.4th 981 (2003)................................22

25

<u>People v. Williams</u>
26 Cal.4th 779 (2001).....................................22

26

27

28

# TABLE OF AUTHORITIES (cont.)

**Page(s)**

## Federal Statutes

28 U.S.C.
§ 2243......................................................24
§ 2247......................................................24
§ 2254(d)...................................................11

Rules Governing § 2254 Cases in the U.S. District Courts
Rule 4......................................................24
Rule 5......................................................24

## State Statutes

California Penal Code
§ 186.22(b)................................3, 15, 19, 20
§ 187.......................................................2
§ 245(a)(2)............................................2, 22, 23
§ 246.......................................................2
§ 664.......................................................2
§ 667(b)....................................................3
§ 12022.53(b)...............................................3
§ 12022.53(c)...............................................3
§ 12022.53(d)...............................................3

California Evidence Code
§ 352.......................................................9
§ 805......................................................14

## Constitutional Provisions

U.S. Constitution, Fifth Amendment..........................1
U.S. Constitution, Sixth Amendment..........................1
U.S. Constitution, Fourteenth Amendment.............1, 14, 18

## Other Authorities

Antiterrorism and Effective Death Penalty Act.........11, 19

1   JOSE ANTHONY BORJA
    CDCR # T-54311
2   P.O. Box 8504
    Coalinga, CA 93210
3
    In Pro Se
4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9              FOR THE CENTRAL DISTRICT OF CALIFORNIA

10

11   **JOSE ANTHONY BORJA,**                    No._____

12                           Petitioner,        **Memorandum Of Points And
                                                Authorities In Support
13        **v.**                                Of Petition For Writ Of
                                                Habeas Corpus**
14   **MATTHEW CATE, Secretary of the CDCR,**
                                                (28 U.S.C. § 2254)
15                           Respondent.

16

17                          **INTRODUCTION**

18        The instant petition challenges a state conviction for a

19   shooting, following a hung jury where seven jurors could not

20   find that Petitioner was the shooter.  The subsequent trial was

21   vitiated by a gang expert's improper opinion on the ultimate

22   issue before the jury, which led to a conviction based on

23   insufficient evidence.  The state court's opinion that these

24   errors did not violate Petitioner's Fifth, Sixth and Fourteenth

25   Amendment rights is based on an unreasonable application of U.S.

26   Supreme Court authority and an unreasonable determination of the

27   facts in light of the evidence adduced in the state proceedings.

28        At the time of the charged acts, Petitioner was a 31-year-

old former gang member who worked at a roofing company, supported a wife and two young children, and lived with and cared for his mother.  The prosecution alleged that Petitioner was speeding in his car down a street near his home when he was yelled at by Carlos Andrade to slow down.  Petitioner allegedly stopped the car and stared at Andrade, then left and came back a few minutes later and shot at him, hitting him once in the back and striking a neighbor's car and garage.  The incident was not fatal, and Andrade was not seriously injured.

Unfortunately, the second trial was infected by the testimony of an expert prosecution witness who gave his opinion that Petitioner's actions were done to promote, benefit or assist his former gang.  This opinion substantially and prejudicially influenced the jury because it told them how the case itself should be decided, and it was a critical factor that helped lead to a conviction based on insufficient evidence, and a resulting sentence of 233 years to life.  After a careful review of the record below, this Court should grant the instant petition and afford Petitioner a new trial.

### STATEMENT OF THE CASE

Petitioner was charged in an information with one count of premeditated attempted murder (Penal Code §§ 664/187[1]/), five counts of assault with a firearm (§ 245(a)(2)), and one count each of shooting at an occupied vehicle and an inhabited dwelling (§ 246).  As to all counts it was further alleged that the offenses were committed for the benefit of a street gang

---

1. All further unspecified code sections refer to the California Penal Code.

within the meaning of § 186.22(b)(1)(c), and that Petitioner personally and intentionally discharged a firearm in violation of § 12022.53(b), (c), and (d).  It was also alleged that appellant had suffered five prior convictions within the meaning of the three strikes law, and one prior conviction within the meaning of § 667(b).  (CT 46-53.)

A trial by jury was commenced and resulted in a mistrial due to a hung jury.  The jury's final vote was seven to five in favor of acquittal.  (2 RT B-12.[2/])  The jurors in favor of acquittal were not convinced that Petitioner was the shooter.  (1 RT B-12.)

A new jury was impaneled and a second trial commenced.  The second jury convicted Petitioner of all charges and found all enhancement allegations to be true.  (CT 263-271.)

Petitioner was subsequently sentenced by the trial court to a determinate term of 58 years to be followed by an indeterminate term of 175 years-to-life.  (CT 323-325.)

Petitioner filed a timely appeal which was denied.  (CT 326; see also, Exhibit "B".)  The judgment on appeal was affirmed in an unpublished decision.  (See Exhibit "A".)

A petition for review was timely filed.  (See Exhibit "C".)  The petition was denied in an unpublished opinion on January 3, 2008.  (See Exhibit "D".)

///

///

///

---

2. The Reporter's Transcript comprises both trials.  The first trial that resulted in a hung jury is found in Volume 1 through Volume 2, pg. B-17.  Volume 2 begins with pages A1-A13, B1-17, and then page 1.

1  **STATEMENT OF THE FACTS**

2  **I. The Allegations Of Attempted Murder.**

3      **A. Prosecution Case.**

4      On November 4, 2005, at about 8:00 p.m., Petitioner was driv-

5  ing recklessly down Jellick Avenue in East Valinda. (2 RT 116,

6  185.) Carlos Andrade was standing in front of the residence of

7  a neighbor, Cecilia Chavez, who lived at 447 Jellick Avenue, and

8  yelled at Petitioner to slow down. (2 RT 116.) Andrade knew

9  Petitioner by the name of "Toro." (2 RT 116.) Petitioner stopped

10 his car, got out, and stared at Andrade for about one minute.

11 (2 RT 116.) Petitioner then got back in his car and drove away.

12 (2 RT 116.)

13     About five to ten minutes later, Petitioner returned and got

14 out of his car carrying a handgun. (2 RT 116.) He pointed the

15 gun at Andrade and fired a shot. (2 RT 117.) Andrade turned and

16 started running, but was struck in the lower back with a bullet.

17 (2 RT 117.)

18     **B. Defense Case.**

19     Andrade testified that he did not know who the shooter was

20 because he had his back to the street when the shooter drove up.

21 (2 RT 68.) Andrade was drinking beers prior to his confrontation

22 with the shooter. (2 RT 69.)

23     Andrade denied that he ever told any officer that the shooter

24 was "Toro" or drove a black Mustang. (2 RT 74.)

25     Andrade said that it was one of the investigating officers

26 who circled the photographic line-up card presented to him. (2

27 RT 102.) They told him to sign the card, so he did, but he did

28 not know why they wanted him to sign it. (2 RT 104.)

1    Deputy Gallagher, the responding deputy, said that Andrade's
2  use of the words "cholo" and "Toro" led him to believe the shoot-
3  ing was a gang-related incident.  (2 RT 205.)  The defense argued
4  that once Gallagher described the black vehicle and the name
5  "Toro" during his broadcast, the police made no effort to inves-
6  tigate any other possibilities.  (3 RT 379, 390.)
7    The defense also noted that Andrade's inculpatory statements
8  to the detective were unreliable in light of his admission that he
9  had been drinking all day prior to the shooting, although no one
10 investigated this point.  (3 RT 393, 396.)
11    The identifications given to Detective Skahill were further
12 weakened by the fact that he failed to tape-record the statements
13 at the police station, weakly asserting that his tape recorder was
14 not working and not explaining why he did not simply borrow
15 another.  (3 RT 385, 390.)
16    The defense also noted that Detective Skahill recently had an
17 unrelated altercation with Petitioner, which resulted in a
18 profanity-laced shouting match.  (3 RT 272-274.)
19 **II. The Allegations Of Assault.**
20    **A. Prosecution Case.**
21    Just before the shooting started, Andrade's neighbor, Rene
22 Bautista Sr., drove up to his driveway on Jellick Avenue next to
23 the driveway where Andrade was standing.  (2 RT 135.)  Bautista
24 was accompanied in the car by his pregnant wife and two children.
25 (2 RT 135.)  As Bautista approached his driveway, he saw Andrade
26 and was about to say hello.  (3 RT 180.)  He then saw a person
27 pointing a gun at Andrade.  (3 RT 180.)  Thereafter, he saw
28 Andrade turn around and get shot in the back.  (3 RT 181.)

1  Bautista was in his car about 35 feet from Andrade.  (3 RT 207.)

2  None of the Bautista's were injured.  (3 RT 183.)

3      The Bautistas have a locked gate in their driveway, and 11

4  year-old Rene Jr. had been trained to leave the car and open the

5  gate when his father approaches the driveway.  (2 RT 135.)  The

6  boy had left the car on this occasion on his way to unlocking the

7  gate, when the first shot was fired.  (2 RT 137.)  Rene Sr.

8  instructed his son to go to the other side of the car, and told

9  the rest of his family to get down inside the car.  (2 RT 141.)

10  Three or four shots were fired.  (2 RT 138.)  Bautista recognized

11  Petitioner's black Mustang as he drove away.  (3 RT 186.)  He knew

12  Petitioner because of an incident the previous year where, follow-

13  ing a dispute, Petitioner ran over the Bautista's family dog.  (3

14  RT 182-183.)

15      After the shooting, Bautista called the police who arrived

16  within ten minutes.  (2 RT 143.)  Officers interviewed Andrade and

17  Bautista, and thereafter provided Petitioner's name to the police,

18  who issued a broadcast indicating the suspect was a gang member

19  named "Toro" driving a black Mustang.  (3 RT 179.)  Police dis-

20  covered that one of the bullets hit Bautista's car on a lower door

21  panel, and another had struck his garage.  (3 RT 183-184.)  Peti-

22  tioner, who lived with his mother on nearby McClaren Street, was

23  arrested several days later.  (3 RT 218.)

24      Detective Steven Skahill, a detective with the Los Angeles

25  Sheriff's Department gang unit, was called that evening to inves-

26  tigate the shooting.  (3 RT 210.)  Detective Skahill, using Deputy

27  Sheriff J.J. Garcia as a Spanish interpreter, interviewed Carlos

28  Andrade and then Rene Bautista.  (3 RT 212-213.)  The interviews,

1  which took place five days later at the police station, were not

2  tape-recorded.  (3 RT 261, 265.)

3      Detective Skahill showed each person a photographic lineup

4  containing six pictures.  (3 RT 213, 267.)  Before showing them

5  the photographs, he read the standard advisement stating the wit-

6  nesses need not identify anyone.  (3 RT 214.)  Andrade viewed the

7  photo lineup and identified No. 2, which showed Petitioner's

8  photo.  (3 RT 215, 267.)  Bautista circled No. 2 as well, but then

9  selected No. 4, saying that person had a similar mustache.  (3 RT

10  216.)

11      **B. Defense Case.**

12      Bautista was not sure who the shooter was.  (2 RT 164.)

13  Bautista saw only that shots were fired from a black vehicle, as

14  he was focused on his family's safety once the shooting began.  (2

15  RT 142, 161.)

16      Bautista denied ever telling the detective that the shooter

17  was a Hurley Street gangster.  (2 RT 152.)  Bautista said that his

18  ID of a black Mustang was based on a prior observance of it, not

19  that he had seen it on the night of the shooting.  (2 RT 163.)

20      The defense emphasized that Bautista's identification of

21  Petitioner when speaking with Detective Skahill was weak since he

22  selected Petitioner's photograph initially (No. 2), but then

23  changed his mind and selected No. 4.  (2 RT 149.)  Moreover,

24  Bautista had a grudge against Petitioner due to a recent incident

25  in which Petitioner had run over the Bautista's family dog.  (3

26  RT 181-182.)

27  ///

28  ///

III. **The Gang Enhancement Allegations.**

    A. **Prosecution Case.**

    In his opening argument, the prosecutor told the jury that they would be hearing from Detective Skahill, and that Skahill's opinion was that "it's a gang case." (2 RT 62.)

    Detective Skahill was an experienced gang investigator. (3 RT 210.) He had worked in the area out of the Industry Sheriff's Station for 20 years, most of that time investigating the local gangs. (3 RT 210.)

    He testified that there are two primary gangs (both of which are Hispanic) in the area -- the Puente Street gang and the East Side Dukes. (3 RT 219.) "Hurley Street" is a subgroup of the Puente gang and had approximately 40 members, including about 10-15 hardcore gang members willing to commit crimes on behalf of the gang. (3 RT 220, 272.) He testified that Petitioner was a member of the Hurley Street gang -- as evidenced by the "Hurley Street" tattoo on his chest, information on a field identification (FI) card kept by the police, and "what I gathered too." (3 RT 272.)

    Skahill testified that in his opinion the present shooting was committed to promote, assist or further the Hurley Street gang. (3 RT 233-234.) This conclusion was based on the fact that Petitioner had been disrespected by Andrade, and the gang needed to retaliate following acts of disrespect in order to maintain fear in the neighborhood. (3 RT 233-234.)

    According to Skahill, once Andrade yelled at Petitioner to drive more carefully, Petitioner, as an active gang member, had to respond with aggression as he would have been viewed as a coward if he acted otherwise, resulting in a loss of respect for the

1  gang.  (3 RT 234-237.)

2      Skahill felt that the incident was not simply the act of two

3  persons involved in a road rage incident, because those types of

4  incidents are spontaneous, whereas here Petitioner left the scene

5  and returned with a gun minutes later to shoot Andrade.  (3 RT

6  291, 312-313.)

7      **B. Defense Case.**

8      There was no reliable evidence showing the offense was gang-

9  related, as the shooter did not identify any gang, issue a gang

10  challenge or indicate he was retaliating for an act against the

11  gang.  (3 RT 205.)  The more obvious explanation for the act was

12  that it was a form of road rage based upon the overreaction of a

13  "hot head."  (3 RT 280, 376.)

14      Defense counsel objected to Detective Skahill's testimony on

15  relevance grounds under Cal. Evidence Code § 352 and foundation

16  grounds as well.  (3 RT 221.)  Defense counsel noted that there

17  was a "continuing objection" in this area.  (3 RT 221.)

18      Skahill admitted that it's possible that the conduct of Peti-

19  tioner and Andrade was consistent with two jerks "MF'ing" each

20  other in a road rage and not necessarily a matter of Petitioner

21  saving face for any gang.  (3 RT 280.)

22      When asked why he believed the shooting was gang-related,

23  Skahill said:

24          The reason that this is a gang-related incident
            is due to the fact that [Petitioner] is known in the
25          area as a gang member.

26  (3 RT 234.)

27      Skahill also felt that the fact that the crime was com-

28  mitted in the territory of the Hurley Street gang showed that

1  it was done to benefit the gang.  (3 RT 233-234.)

2      Although no evidence was ever presented that anyone else
3  besides Andrade and possibly Bautista saw the shooting, Skahill
4  stated Petitioner had to protect his gang's reputation after
5  Andrade confronted him because "everybody" saw the incident.  (3
6  RT 235.)

7      Detective Skahill admitted that Petitioner never identified
8  himself as a Hurley Street gang member.  (3 RT 272.)  Moreover,
9  the FI card in 2001 showed Petitioner was not an active gang mem-
10 ber.  (3 RT 277.)  Also, the officer's opinion that Petitioner was
11 a gang member was based in part upon a contact two months before
12 the shooting where Petitioner was the victim of a crime the detec-
13 tive was investigating, and he ended up in a profanity-laced
14 tirade with Skahill after the detective impounded Petitioner's
15 car.  (3 RT 273.)

16     Detective Skahill acknowledged that as few as 10 of the 40
17 Hurley Street gang members were active "hard core" members who
18 would commit crimes for the benefit of the gang.  (3 RT 272.)
19 Others were grouped into two categories including the young
20 "wannabes" (who may commit crimes to impress the gang), and the
21 older "hangers on" who have grown up, gotten jobs, have families
22 or perhaps come from prison and are no longer active in crime.  (3
23 RT 268-270.)

24     These "hangers on" may drink beer or do drugs with active
25 members, but they no longer commit crimes for the gang.  (3 RT
26 269-270.)  Hangers on are usually people over 30 years old with
27 wives, children and jobs.  (3 RT 270.)

28     Petitioner was 31 years old at the time of the offense with a

-10-

1  wife, two daughters and a job with a roofing company.  (3 RT 271.)

2  He fit the profile of a "hanger on" who was no longer active.  (3

3  RT 270.)  That he still had the "Hurley Street" tattoo on his

4  chest did not mean that he was active in gang crimes, as tattoos

5  are essentially permanent.

6      In further support of Petitioner's lack of any gang ties was

7  the fact that police at the Industry Sheriff's Station segregate

8  gang members in the jail to prevent violence among inmates, yet

9  Petitioner was not segregated by a gang classification after

10 his arrest.  (3 RT 278, 279.)

11     Skahill noted that the last Field ID card report, from 2005,

12 listed Petitioner as the victim of a crime, not the perpetrator.

13 (3 RT 225.)

14     Nevertheless, Skahill testified that Petitioner fit the pro-

15 file of both a "hanger on" and a "hard core" gang member due to

16 the incident two months earlier.  (3 RT 273.)

17                    **STANDARD OF REVIEW**

18     This petition is governed by the AEDPA.  See <u>Woodford v.</u>

19 <u>Garceau</u>, 538 U.S. 202, 204 (2003).  Under the AEDPA, a petition

20 can not be granted on any claim that was adjudicated on the merits

21 in State court proceedings unless the adjudication of the claim:

22         (1) resulted in a decision that was contrary to, or
           involved an unreasonable application of clearly estab-
23         lished Federal law, as determined by the Supreme Court
           of the United States; or
24
           (2) resulted in a decision that was based on an
25         unreasonable determination of the fats in light of the
           evidence presented in the State court proceeding.
26
   28 U.S.C. § 2254(d).
27
28     **The "Unreasonable Application" Clause.**  A state court's deci-

1  sion is an "unreasonable application" of Supreme Court law if "the

2  state court correctly identifies the governing legal principle...

3  but unreasonably applies it to the facts of the particular case."

4  Bell v. Cone, 535 U.S. 685, 694 (2002).  "The federal habeas court

5  making the 'unreasonable application' inquiry should ask whether

6  the state court's application was objectively unreasonable."

7  Williams v. Taylor, 529 U.S. 362, 409 (2000).  The standard does

8  not require that all reasonable jurists would agree that the

9  determination was unreasonable.  Id., at 377.

10      The Term "Unreasonable."  While acknowledging that the "term

11  'unreasonable' is no doubt difficult to define," the high court

12  has offered no guidelines other than that "a federal habeas court

13  may not issue the writ simply because the court concludes in its

14  independent judgment that the relevant state court decision ap-

15  plied clearly established federal law erroneously or incorrectly.

16  Rather, that application must also be unreasonable."  Williams,

17  529 U.S. at 410-11.

18      The "evaluati[on] whether a rule was unreasonable requires

19  considering the rule's specificity" and the "more general the

20  rule, the more leeway the courts have in reaching outcomes in case

21  by case determination."  Yarborough v. Alvarado, 541 U.S. 652, 664

22  (2004).

23      Whatever 'deference' Congress had in mind with respect to the

24  phrase, "it surely is not a requirement that federal courts actu-

25  ally defer to a state-court application of the federal law that

26  is, in the independent judgment of the federal court, in error."

27  Williams, 529 U.S. at 387.

28

1

**ARGUMENT**

2

**I**

3

4

5

**The State Court Unreasonably Applied U.S. Supreme Court Authority In Its Opinion That It Was Not Prejudicial Constitutional Error For A Gang Expert To Testify That He Believed Petitioner Was Guilty Of All Gang Enhancement Allegations**

6

**A. Summary of the Argument**

7

In this case, Petitioner was facing a maximum of 80 years on

8

his gang enhancement allegations alone.  The jury's verdict was

9

substantially and injuriously influenced by the prosecutor's gang

10

expert witness, Steven Skahill, whose testimony went far beyond

11

what was legally permissible.  Skahill testified that Petitioner

12

was guilty of the gang enhancements.  This opinion testimony vio-

13

lated Petitioner's Fourteenth Amendment rights under clearly

14

established high court precedent because it undermined the jury's

15

responsibility to find the ultimate facts beyond a reasonable

16

doubt.

17

**B. Governing Legal Standards**

18

"The constitution gives a criminal defendant the right to

19

have a jury determine, beyond a reasonable doubt, his guilt of

20

every element of the crime with which he is charged." U.S. v.

21

Gaudin, 315 U.S. 506, 522 (1995).

22

"[I]n criminal cases, the ultimate test of any device's con-

23

stitutional validity in a given case remains constant: the device

24

must not undermine the factfinder's responsibility at trial, based

25

on evidence adduced by the State, to find the ultimate facts

26

beyond a reasonable doubt." Ulster County Court v. Allen, 442

27

U.S. 140, 155 (1979).

28

"[T]he jury's constitutional responsibility is not merely to

1    determine the facts, but to apply the law to those facts and draw

2    the ultimate conclusion of guilt or innocence." U.S. v. Gaudin,

3    515 U.S. at 514.

4        Under Cal. Evid. Code § 805, "Testimony in the form of an

5    opinion that is otherwise admissible is not objectionable because

6    it embraces the ultimate issue to be decided by the trier of fact."

7        However, expert opinion testimony on the ultimate issue of

8    guilt for a gang enhancement should be excluded if it amounts to

9    no more than a general belief as to how the case should be decided.

10   People v. Killebrew, 103 Cal.App.4th 644, 651 (2002).

11       Allowable expert testimony also does not include testimony

12   that a specific individual possessed a specific intent.  Rather,

13   allowable expert testimony includes: that concerning the size, com-

14   position or existence of a gang, gang turf or territory, an indi-

15   vidual defendant's membership in, or association with, a gang, the

16   primary activities of a specific gang, motivation for a particular

17   crime, whether and how a crime was committed to benefit or promote

18   a gang, rivalries between gangs, gang-related tattoos, gang graf-

19   fiti and hand signs, and gang colors or attire.  In re Frank S.,

20   141 Cal.App.4th 1192 (2006).

21   C. **The Gang Expert Testimony Prejudicially Violated Petitioner's
        Fourteenth Amendment Rights Under U.S. Supreme Court Authority.**

22       1. The Gang Expert's Testimony On Petitioner's Guilt Violated
          Petitioner's Fourteenth Amendment Rights.

23

24       Detective Skahill's testimony was constitutionally improper

25   because his expertise was on the subject of the enhancements them-

26   selves: gangs.  It is likely any jury would place great weight on

27   any ultimate conclusions a gang expert drew on gang issues, and

28   such is the case here.  Skahill's testimony was supposed to be in

1  regard to facts about the Hurley Street gang, gang culture in

2  general, or the facts regarding how one can identify certain

3  conduct as being gang-related.  But instead, Skahill went further,

4  and put himself in the juror's seat by telling them how he would

5  have cast his vote if he were a juror: guilty on all gang enhance-

6  ments.

7      Skahill's testimony thus suggested to the jury that they

8  could delegate their responsibility to determine the ultimate

9  issue under § 186.22 by substituting their own factual and legal

10  determinations for his.  Skahill's opinion testimony on

11  Petitioner's guilt wasn't evidence the jury could weigh and

12  consider.  Rather, it was an opinion on how the case should be

13  decided, which the jury could accept or reject.  It is the fact

14  that such an opinion carries great weight from an expert on the

15  very issue before the jury, that makes the violation of constitu-

16  tional magnitude.

17      The expert testimony in People v. Killebrew provided the

18  only evidence to establish the elements of the crime.  The court

19  thus found that it "did nothing more then inform the jury how

20  [the expert] believed the case should be decided."  Killebrew,

21  103 Cal.App.4th at 651.

22      Skahill's testimony lightened the jury's constitutional res-

23  ponsibility to "draw the ultimate conclusions of guilt or inno-

24  cence."  See, U.S. v. Gaudin, 515 U.S. at 514.  Skahill's tes-

25  timony also "undermin[ed] the factfinder's responsibility...to

26  find the ultimate facts beyond a reasonable doubt," in violation

27  of Gaudin and Ulster County Court.

28      2. The Gang Expert's Testimony Had A Substantial And

1    Injurious Influence On The Jury's Verdict.

2    The gang expert's improper testimony was prejudicial under

3    the Brecht standard because the gang evidence against Petitioner

4    was worse than weak, it was nonexistent.  The only evidence

5    adduced that tied Petitioner to the Hurley Street gang was a tat-

6    too he had received many years earlier.  The police's own Field

7    Identification cards showed that Petitioner was not an active gang

8    member.  Plus, there was no evidence that anyone observed Carlos

9    Andrade's yelling at Petitioner.  Thus, Skahill's testimony was

10   based on speculation and conjecture.  Petitioner's conduct could

11   easily have been seen as a road rage incident.  He was speeding,

12   Carlos yelled at him, he stared menacingly at Carlos, got a gun,

13   and came back to confront and shoot Carlos.  Such incidents, how-

14   ever illogical and criminal, are an everyday occurrence.  However,

15   a defendant's mere prior gang involvement does not ipso facto make

16   every such incident gang-related.

17   Even if Petitioner was still an active gang member at the

18   time, the evidence did not show that his crime was to benefit his

19   gang.

20   Detective Skahill was guilty of a classic logical fallacy

21   called "affirmation of the consequent."  He used the possession of

22   a characteristic to justify including something into a category of

23   things that possess that characteristic.  An example would be "all

24   crows are black, Fluffy is black, therefore Fluffy is a crow."

25   Here, Skahill did the same thing.  His conclusion, distilled to

26   is simplest expression was no more than: "Petitioner was a gang

27   member, Petitioner committed a crime, therefore Petitioner's crime

28   was committed to benefit, assist, or encourage the gang."

1  Skahill's error in logic underscores the seriousness of his preju-

2  dicial opinion testimony because absent such an opinion the jury

3  would have been left with only the facts regarding Hurley Street,

4  Petitioner's tenuous or nonexistent ties to the gang, and a crime

5  which exhibited none of the multifarious hallmarks of a gang-

6  related crime found in the California case law cited above.

7  **D. The State Court's Opinion Was Unreasonable.**

8       The California Court of Appeal's opinion stated that Peti-

9  tioner's claim that Skahill's testimony rendered the trial "fun-

10  damentally unfair" was rendered moot by the determination that

11  the testimony was properly admitted.  (Exhibit "A", p. 9, fn.

12  10.)

13       The court stated that Skahill's testimony was "premised upon

14  hypothetical facts about gang expectations 'properly rooted in

15  the evidence presented at trial.'"  (See Exhibit "A", p. 10.)

16       But Skahill's testimony was not "premised upon hypothetical

17  facts" at all.  Skahill was <u>directly asked</u> by the prosecutor for

18  his opinion on whether Petitioner was guilty of the gang

19  enhancements:

20            [Q:] ...Do you have any opinion with respect to
         whether this offense was committed for the benefit
21       of or at the direction of or in association with a
         criminal street gang?
22

23  (2 RT 233:17-20.)  Skahill's reply goes on for nearly three pages,

24  citing specific facts about Petitioner's case, not hypotheticals.

25  Thus, the court is incorrect that Skahill's opinion was the type

26  of culture and habit testimony approved in <u>Gardeley</u> and subsequent

27  cases or that was "premised upon hypothetical facts."  (Exhibit

28  "A", p. 10.)  The prosecutor was not asking for a conclusion based

1   on hypotheticals, he explicitly asked for an opinion based on the

2   actual facts of Petitioner's actual case.

3        The unreasonability of the court's opinion is thus shown by

4   its mischaracterization of Skahill's testimony, his opinion, its

5   admissibility, and its prejudicial effect.   Accordingly, this

6   Court should reject the state court's opinion.

7                                 II

8        **The State Court Unreasonably Applied U.S. Supreme Court**
    **Authority In Its Opinion That There Was Sufficient Evidence To**
9   **Find That Petitioner's Conduct Satisfied The Gang Enhancement**
    **Requirements**

10  **A. Summary of the Argument.**

11       No evidence was presented at trial that Petitioner intended

12  to promote, further or assist the Hurley Street gang when he shot

13  Carlos Andrade besides the conclusory and speculative assertions

14  of Detective Skahill.   Absent Skahill's improper opinion that

15  Petitioner should be found guilty of the gang enhancement alle-

16  gations, no rational trier of fact could have found Petitioner

17  guilty of these enhancements.

18       The California Court of Appeals' opinion that there was suf-

19  ficient evidence to support these enhancement findings is based on

20  an unreasonable application of <u>Jackson v. Virginia</u> and its

21  progeny.   The court's opinion unreasonably afforded weight to

22  insubstantial evidence in support of its flawed reasoning, even

23  though it admitted in its opinion that "it would appear quite

24  plausible" that Petitioner's crime was "not for the benefit of the

25  Hurley Street gang."

26  **B. Governing Legal Standards.**

27       Under the due process clause of the Fourteenth Amendment, a

28

1 criminal defendant may not be convicted unless sufficient evidence

2 is adduced at trial to justify a rational trier of fact in finding

3 guilt beyond a reasonable doubt.  <u>Jackson v. Virginia</u>, 443 U.S.

4 307, 319 (1979).

5      "An expert's testimony as to a theoretical conclusion or

6 inference does not rescue a case that suffers from an underlying

7 insufficiency of evidence to convict beyond a reasonable doubt."

8 <u>Smith v. Mitchell</u>, 437 F.3d 884, 890 (9th Cir. 2006).

9      To obtain a true finding on an allegation of a criminal street

10 gang enhancement, the State must prove the crimes at issue were

11        committed for the benefit of, at the direction of, or
         in association with any criminal street gang, with the
12        specific intent to promote, further, or assist in any
         criminal conduct by gang members....
13
Cal. Pen. Code § 186.22(b)(1).
14
**C. There Was Insufficient Evidence That Petitioner's Conduct Met**
15 **   The Gang Enhancement Requirements.**

16      In an instructive AEDPA case, the Ninth Circuit held that

17 there was insufficient evidence to support a California § 186.22

18 gang sentencing enhancement under either the <u>Jackson</u> standard

19 alone or with additional deference under the AEDPA.  <u>Garcia</u>

20 <u>v. Carey</u>, 395 F.3d 1099, 1104 (9th Cir. 2005).

21      In <u>Garcia</u>, the court found that a gang expert's testimony

22 that Garcia was a member of a gang, that the robbery was committed

23 on gang territory, and that the gang was "turf oriented," was

24 insufficient evidence to support the conclusion that Garcia's

25 robbery was committed with the specific intent to promote,

26 further, or assist other gang related criminal activity.  <u>Id.</u>

27      The reasoning of <u>Garcia</u> applies equally in the instant case.

28 Here, as in <u>Garcia</u>, a gang expert testified that the Petitioner

1  was a member of a gang and the crime was committed on gang terri-

2  tory.   And just as in <u>Garcia</u>, the detective here never testified

3  why a crime committed by a gang member on the gang's "turf" is

4  <u>ipso</u> <u>facto</u> a crime committed with specific intent to promote,

5  further, or assist other gang related criminal activity.

6      Under Detective Skahill's reasoning, <u>any</u> crime committed by

7  a gang member (or former gang member) in an area where the gang

8  member lives or frequents would qualify for the § 186.22 enhance-

9  ment.   This is because any crime could be rationalized to be done

10  to terrify residents or "save face," etc.   This kind of reasoning

11  is purely speculative, and a finding of guilt can not be based on

12  speculation or conjecture.

13  **D. The State Court Unreasonably Applied <u>Jackson v. Virginia</u>.**

14      The Court of Appeals, in denying Petitioner's claim of insuf-

15  ficient evidence regarding the gang enhancement, stated that

16          Indeed, it would appear quite plausible [Peti-
        tioner's] conduct was intended to enhance his own per-
17      sonal stature within the community -- misguided though
        he was -- and not for the benefit of the Hurley Street
18      gang.  But that does not mean the jury's finding was
        unreasonable.

19
(Exhibit "A", p. 7.)  However, it is precisely because it is
20
"quite plausible" that the crime was not gang related that the
21
jury's finding <u>was</u> unreasonable.
22
    The court lists several pieces of "evidence" which the jury
23
may have used to make their finding, but this "evidence" is not
24
evidence at all.
25
    The court first states that Petitioner was identified by both
26
victims as a gang member, but this would have been so regard-
27
less of whether the crime was gang-related or not, or whether
28

1  Petitioner was still a gang member or not, because Petitioner had

2  lived in the area for years, and the victims knew him as a former

3  gang member.

4      The court next mentions a "suspected gang shooting and colli-

5  sion between two cars" months earlier involving Petitioner.  How-

6  ever, the court conveniently neglected to mention that in this

7  incident it was Petitioner who was the victim, and that he was

8  never even charged with any crime, much less a gang-related one.

9  It stands to reason that an ex-gang member would be the target of

10 violence by his former gang members, and such could easily have

11 been the case here.  Regardless, the fact that Petitioner was

12 supposedly the victim of a gang-related incident months earlier

13 is not even circumstantial evidence that his crime was "committed

14 for the benefit of, at the direction of, or in association with"

15 a street gang, "with the specific intent to promote, further,

16 or assist in any criminal conduct by gang members."

17     The court next cites Skahill's opinion that the location of

18 the assault was in the heart of Hurley Street gang territory as

19 having evidentiary value.  It does not.  If it did, any crime com-

20 mitted by any gang member in their "neighborhood" would automa-

21 tically qualify for the gang enhancement, even absent a showing

22 that the crime promoted or benefited the gang.

23     Finally, the court cites the "mad-dogging" stance Petitioner

24 assumed and the ruthless nature of the attack were, according

25 to Skahill, consistent with a typical gang's demand for respect.

26 (Exhibit "A", p. 7.)  However, what Skahill called "mad-dogging"

27 was just an intimidating stare.  And since all assaults with a

28 deadly weapon are "ruthless," and Petitioner's was no more so than

1 any other type under the statute, these facts also fail to show
2 specific intent that the crime was to promote or benefit his gang.
3     In sum, if Petitioner had never been a gang member, the sup-
4 posed "gang evidence" of Skahill would have been inadmissible and
5 squarely labeled as conjecture.  But the fact that a person was
6 formerly a gang member should not allow any future crime he commits
7 to be automatically stamped as "gang-related."  The fact that
8 Skahill's testimony has no basis absent the old evidence of Peti-
9 tioner's prior gang involvement, coupled with the court's tenuous
10 use of evidentiary bases for the true finding which were in fact
11 without basis, shows why its opinion was an unreasonable appli-
12 cation of Jackson v. Virginia.

### III

**The State Court Unreasonably Applied U.S. Supreme Court Authority In Its Opinion That There Was Sufficient Evidence That Petitioner Was Aware Of The Existence Of The Bautistas When He Shot Carlos Andrade**

**A. Summary of the Argument.**

    Since no evidence was adduced that Petitioner was aware of the presence of the Bautistas when he shot Carlos Andrade, he could not have been found guilty for assaulting them with a deadly weapon under state law.  Petitioner's conviction on these counts was thus unconstitutional, and the appellate court's opinion to the contrary unreasonable.

**B. Governing Legal Standards.**

    Under state law, a defendant can not be convicted of assault with a firearm under § 245 if he did not know of the victim's presence.  People v. Williams, 26 Cal.4th 779, 783 (2001); see also, People v. Rivas, 112 Cal.App.4th 981, 998 (2003).

**C. There Was Insufficient Evidence That Petitioner Was Aware
Of The Bautistas When He Shot Carlos Andrade.**

The evidence adduced at trial showed that Petitioner was focused solely on shooting Carlos Andrade. No evidence was introduced, physical or testimonial, that Petitioner was able to view the Bautistas from his vantage point or that he did in fact view them. Thus, there was no evidence he knew of their existence, which is required under state law for a conviction under § 245(a)(2).

The prosecution thus failed to meet the burden of proof with regard to the Bautista shootings, and the jury convicted Petitioner based on insufficient evidence, in violation of his Fourteenth Amendment right under <u>Jackson v. Virginia</u>, 443 U.S. 307, 318 (1979) and its progeny.

**D. The State Court Unreasonably Applied <u>Jackson v. Virginia</u>
In Its Denial Of Petitioner's Claim.**

The unreasonability of the court's opinion on this issue is quite clear. The court stated that

> The jury was presented with evidence the Bautistas' car had just driven into the driveway adjacent to the yard where Andrade stood when [Petitioner] fired, and there was no evidence [Petitioner] did not see the car or its individual occupants. Accordingly, the jury reasonably could have found that [Petitioner] harbored the necessary intent to assault the members of the Bautista's family.

(Exhibit "A", p. 15.) The court has it exactly backwards. The burden of proof was on the prosecution to prove that Petitioner was aware of the presence of the Bautistas, not the other way around as it stated.

The unreasonability of the state court's application of

1   <u>Jackson</u> is thus shown by its burden-shifting analysis, whereby it

2   required Petitioner to have adduced evidence that he was unaware

3   of the Bautista's, rather than the appropriate prosecutorial burden

4   that actually functioned at trial.

5                               **CONCLUSION**

6        WHEREFORE, for the foregoing reasons, Petitioner respectfully

7   requests that this Court:

8        (1) issue an order directing Respondent to show cause why the

9   writ should not be granted, pursuant to 28 U.S.C. § 2243 and Rule

10  4 of the Rules Governing § 2254 Cases in the U.S. District Courts;

11       (2) order Respondent to produce the record on appeal and

12  other relevant records in this case, pursuant to 28 U.S.C. § 2247

13  and Rule 5;

14       (3) after full hearing, issue a writ of habeas corpus dis-

15  charging Petitioner from his unconstitutional confinement and

16  restraint, or affording him a new trial; and

17       (4) grant such other relief as may be appropriate and dispose

18  of the matter as law and justice require.

19  Dated: March 29, 2009

                        Respectfully submitted,

20

21

22                      JOSE ANTHONY BORJA,
                        Petitioner in pro se

23

24

25

26

27

28