1

2

3

4

5

6

7

8                    **UNITED STATES DISTRICT COURT**

9                    **CENTRAL DISTRICT OF CALIFORNIA**

10

11   JOSE ANTHONY BORJA,              )    NO. CV 09-2420 DDP (SS)
                                      )
12                 Petitioner,        )
                                      )    **REPORT AND RECOMMENDATION OF**
13          v.                        )
                                      )    **UNITED STATES MAGISTRATE JUDGE**
14   KELLY HARRINGTON, Warden,        )
                                      )
15                 Respondent.        )
     _____)

16

17

18       This Report and Recommendation is submitted to the Honorable Dean

19   D. Pregerson, United States District Judge, pursuant to 28 U.S.C. § 636

20   and General Order 05-07 of the United States District Court for the

21   Central District of California.

22

23                              **I.**

24                          **INTRODUCTION**

25

26       On April 8, 2009, Jose Anthony Borja ("Petitioner"), a California

27   State prisoner proceeding pro se, filed a Petition for Writ of Habeas

28   Corpus by a Person in State Custody (the "Petition") pursuant to 28

1  U.S.C. § 2254.    Petitioner also filed a memorandum of points and
2  authorities in support of the Petition (the "Pet. Memo").    On July 20,
3  2009, Respondent[1] filed an Answer to the Petition (the "Answer"), as
4  well as a memorandum of points and authorities in support of the Answer
5  (the "Answer Memo").    Respondent lodged numerous documents including a
6  two-volume copy of the Clerk's Transcript ("CT") and a two-volume copy
7  of the Reporter's Transcript ("RT") from Petitioner's trial proceedings
8  in the Los Angeles County Superior Court.    On October 6, 2009,
9  Petitioner filed a Reply to the Answer (the "Reply").    For the reasons
10 discussed below, it is recommended that the Petition be DENIED and that
11 this action be DISMISSED with prejudice.

12

13                                    **II.**

14                            **PRIOR PROCEEDINGS**

15

16      On June 29, 2006, a Los Angeles County Superior Court jury
17 convicted Petitioner of attempted murder, five counts of assault with
18 a firearm, and two counts of shooting at an occupied motor vehicle or
19 inhabited dwelling.    (CT 263-71).    The jury also found true numerous
20 sentence-enhancement allegations, including that Petitioner committed
21 his crimes for the benefit of a criminal street gang with the specific
22 intent to promote, further, or assist in any criminal conduct by gang
23 members in violation of California Penal Code section 186.22(b)(1).    (CT
24 264-71).    On August 8, 2006, the trial court, after finding that
25 Petitioner suffered numerous serious or violent prior felony

26 _____

27      [1]  Kelly Harrington, warden of the Kern Valley State Prison in
   Delano, California, where Petitioner is incarcerated, is substituted as
28 the proper respondent.    See Fed. R. Civ. P. 25(d); Rules Governing §
   2254 Cases R. 2(a).

1 │ convictions, imposed a determinate sentence of fifty-eight years and an
2 │ indeterminate sentence of 175 years to life in state prison.  (CT 314-
3 │ 25; RT 440, 448-49).

5 │    On September 26, 2007, the California Court of Appeal found that
6 │ the trial court erroneously calculated Petitioner's sentence and
7 │ remanded the matter for resentencing, but otherwise affirmed the trial
8 │ court's judgment.  (Lodgment G, Unpublished Opinion of the California
9 │ Court of Appeal ("Lodgment G") at 1, 18).  Petitioner subsequently filed
10 │ a petition for review in the California Supreme Court, which was denied
11 │ on January 3, 2008, without comment or citation to authority.  (Lodgment
12 │ I, California Supreme Court Order ("Lodgment I")).

14 │    Pursuant to the California Court of Appeal's remand order, on
15 │ February 6, 2008, the trial court resentenced Petitioner by imposing a
16 │ determinate sentence of forty-six years and an indeterminate sentence
17 │ of 175 years to life in state prison.  (Lodgment J, Petitioner's
18 │ Abstract of Judgment and the Minute Order of February 6, 2008 ("Lodgment
19 │ J")).  Petitioner filed the instant Petition on April 8, 2009.

21 │                              **III.**

22 │                        **FACTUAL BACKGROUND**

24 │    The following facts, taken from the California Court of Appeal's
25 │ unpublished decision, have not been rebutted with clear and convincing
26 │ evidence and must, therefore, be presumed correct.   28 U.S.C. §
27 │ 2254(e)(1).

3

1    On a Friday evening in early November 2005, Carlos
2    Andrade gathered with some friends for a barbecue in the
3    front yard of a home in East Valinda, an unincorporated area
4    of Los Angeles County.  As he stood in front of the house
5    drinking a beer, he saw a black Mustang being driven
6    recklessly up and down the residential street.   Andrade
7    yelled at the driver, whom he recognized as a neighborhood
8    "cholo"[FN2] known as "Toro," to slow down because of the many
9    children who live and play on the street.   The driver
10   stopped, got out of his car and engaged in a staring contest
11   with Andrade.  After a minute or so the driver got back in
12   his car and drove away.  Minutes later he returned and again
13   got out of his car, this time brandishing a handgun.   The
14   driver pointed the gun at Andrade and fired three or four
15   shots.  Andrade turned and ran but was struck in the lower
16   back with a bullet.

17

18         [FN2] The responding deputy testified that Andrade,
19         speaking in Spanish, used this term in referring to
20         [Petitioner].  According to the deputy, "cholo" is
21         a slang term for gangster.

22

23   Just before the shooting started, Rene Bautista,
24   accompanied by his wife and two children, pulled into his
25   driveway next to the yard where Andrade stood.  Bautista's
26   eleven-year-old son left the car to open the locked gate.
27   Bautista then heard a shot coming from Andrade's direction,
28   looked up, saw a muzzle flash and yelled for his family to

4

get down.  One of the shots struck the driver's door of the sports utility vehicle where Bautista sat, and another struck the door to the Bautistas' garage.[FN3]  As the black Mustang sped away, Bautista recognized the car as one driven by [Petitioner], who lived around the corner and was known to be a member of the local Hurley Street gang.  Bautista recognized his car from an encounter with [Petitioner] several months before, when [Petitioner], driving the same black Mustang, intentionally ran over Bautista's dog.  Upon questioning by a deputy sheriff who responded to the call, Andrade too identified [Petitioner] by name as the shooter.

> [FN3] Bautista testified he was about 60-70 feet from the black Mustang at the time the shooting started.  Detective Steven Skahill, who investigated the crime scene, testified Bautista was approximately 35 feet from "the shooting."  A streetlight is located midway between the two homes and was illuminated that night.

Based on the descriptions given by Andrade and Bautista to the responding deputies, [Petitioner] was arrested several days later; and both Andrade and Bautista identified him in a photographic lineup.  After first selecting [Petitioner's] picture, however, Bautista also circled the photograph of a man who, like [Petitioner], wore a mustache.  Both Andrade and Bautista identified [Petitioner's] black Mustang.

5

1    [Petitioner's] first trial ended in a hung jury.  Both
2    Andrade and Bautista were subpoenaed to testify at the
3    retrial.[FN4]    Despite their earlier statements to the
4    responding deputies, both men now professed uncertainty about
5    the identity of the shooter, claiming they had not actually
6    seen the shooter's face.  Under questioning, they insisted
7    they were not afraid to testify, although two deputies
8    testified that each had admitted out of court to being afraid
9    of retaliation from [Petitioner] or other gang members.  In
10   light of Andrade and Bautista's recalcitrance, the responding
11   deputies testified to their earlier statements at the scene
12   of the shooting, and a bilingual deputy testified to
13   Andrade's statements identifying [Petitioner] and his car at
14   the lineup.

15

16        [FN4] At the photographic lineup Andrade had
17        admitted to one deputy he was afraid [Petitioner]
18        would retaliate against him.  When he later failed
19        to appear at the preliminary hearing pursuant to
20        subpoena, he was arrested and incarcerated for 50
21        days to ensure his appearance at trial.  At trial
22        Andrade claimed not to be afraid of testifying and
23        blamed his injury and pain medication for his
24        conflicting statements to the deputies who
25        interviewed him.  He also testified he was not
26        aware of any gang activity in his neighborhood.

27

28

6

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Bautista failed to appear to testify at [Petitioner's] first trial but did appear at the retrial after he was advised the court had issued a bench warrant authorizing his arrest.   Although he first claimed his failure to appear was the result of a miscommunication, he later admitted he did not want to testify at trial because of his fears for his family.   Bautista had earlier confided to a deputy that he had seen gang members driving past his house and staring, thus making him afraid of gang retaliation against his family.

The People also called Detective Steven Skahill, an experienced gang investigator,[FN5] to testify as an expert on gang culture and practices.   Skahill testified two Hispanic gangs claimed the area of the shooting -- the Hurley Street gang and the East Side Dukes -- and identified several Hurley Street gang members who had been convicted of violent crimes. Skahill also testified [Petitioner] had claimed to be a member of the Hurley Street gang and had numerous gang tattoos, including "Hurley Street" across his chest and "SGV" (San Gabriel Valley) on his arm.   Based on the circumstances of the shooting, Skahill expressed his opinion that the offenses had been committed for the benefit of a criminal street gang.   According to Skahill, after the kind of "stare-down" or "mad dogging" contest that occurred between [Petitioner] and Andrade, the gang member would have to "save face" for himself and the gang to promote the gang and preserve its dominance.   If a gang member had been challenged

7

by a member of the community and did not respond, he would be considered weak; and the gang would lose respect.

[FN5] A 24-year veteran of the Los Angeles County Sheriff's Department, Detective Skahill had been working as a gang investigator for more than 17 years, predominantly out of the station that covers the Hurley Street gang territory.

[Petitioner] did not testify and presented only two exhibits in his defense. He was convicted on all counts, and the jury found true the special allegations supporting the gang and firearm enhancements. In a bifurcated proceeding, the court found true the allegations that [Petitioner] had suffered five prior serious or violent felony convictions within the meaning of the "Three Strikes" law ([Cal. Penal Code §§ 667(h)-(i), 1170.12(a)-(d)]) and one prior serious felony conviction under [California Penal Code] section 667, subdivision (a)(1).   [Petitioner] was sentenced to an aggregate state prison term of 58 years to be followed by an indeterminate term of 175 years to life.

(Lodgment G at 2-5).

\\
\\
\\
\\
\\

8

1

2

3

IV.

**PETITIONER'S CLAIMS**

4    Petitioner raises three grounds for federal habeas relief. First,
5    Petitioner contends that the trial court committed constitutional error
6    by allowing a gang expert to testify regarding Petitioner's guilt.
7    (Petition at 5). Second, Petitioner contends that there was
8    insufficient evidence to support the gang enhancement. (Id.). Third,
9    Petitioner contends that his conviction for committing assault with a
10   handgun against the Bautista family was not supported by sufficient
11   evidence. (Id. at 6).

12

13

14

V.

**STANDARD OF REVIEW**

15

16   The Antiterrorism and Effective Death Penalty Act of 1996
17   ("AEDPA"), which effected amendments to the federal habeas statutes,
18   applies to the instant Petition because Petitioner filed it after
19   AEDPA's effective date of April 24, 1996. Lindh v. Murphy, 521 U.S.
20   320, 336, 117 S. Ct. 2059, 138 L. Ed. 2d 481 (1997). "By its terms
21   [AEDPA] bars relitigation of any claim 'adjudicated on the merits' in
22   state court, subject only to the exceptions in §§ 2254(d)(1) and
23   (d)(2)." Harrington v. Richter, __ U.S. __, 131 S. Ct. 770, 784, 178
24   L. Ed. 2d 624 (2011). Pursuant to 28 U.S.C. section 2254(d)(1) and
25   (d)(2), a federal court may only grant habeas relief if the state court
26   adjudication was contrary to or an unreasonable application of federal
27   law or was based upon an unreasonable determination of the facts.

28

9

1  AEDPA limits the scope of clearly established federal law to the
2  holdings of the United States Supreme Court as of the time of the state
3  court decision under review.   Lockyer v. Andrade, 538 U.S. 63, 71, 123
4  S. Ct. 1166, 155 L. Ed. 2d 144 (2003).   Circuit precedent is relevant
5  under AEDPA when it illuminates whether a state court unreasonably
6  applied a general legal standard announced by the Supreme Court.   See
7  Crater v. Galaza, 491 F.3d 1119, 1126 n.8 (9th Cir. 2007).

8

9  Here, Petitioner raised all of his claims before the California
10 Court of Appeal on direct review.   (Lodgment A, Appellant's Opening
11 Brief ("Lodgment A") at 9-21, 26-31).   Petitioner invoked the federal
12 nature of his claim in Ground One by arguing that the gang expert's
13 testimony "deprived [Petitioner] of due process of law, and his right
14 to a jury trial under the Sixth and Fourteenth Amendment to the United
15 States Constitution."   (Id. at 17).   Petitioner invoked the federal
16 nature of his claim in Ground Two by arguing that "[a] conviction that
17 is not supported by substantial evidence also violates the Fourteenth
18 Amendment to the United States Constitution."   (Id. at 11-12).
19 Petitioner invoked the federal nature of his claim in Ground Three by
20 arguing that "[t]he due process clause of the Fourteenth Amendment
21 requires the reversal of a criminal conviction unless sufficient
22 evidence was adduced at trial to justify a rational trier of fact in
23 finding guilt beyond a reasonable doubt."   (Id. at 27).   The California
24 Court of Appeal denied all of Petitioner's claims in a reasoned opinion.
25 (Lodgment G at 5-10, 13-15).

26

27

28

1    Petitioner next raised all of his claims before the California
2  Supreme Court in his petition for review.[2] The California Supreme Court
3  denied Petitioner's petition for review without comment or citation to
4  authority.    (Lodgment I).    The Ninth Circuit has held that the
5  California Supreme Court's silent denial of a petition for review
6  satisfies the exhaustion requirement. See Williams v. Cavazos, 646 F.3d
7  626, 637 n.5 (9th Cir. 2011). However, the Ninth Circuit explained that
8  the silent denial of a petition for review is "not a decision on the
9  merits" and that federal habeas courts must "look through" the silent
10 denial to the last reasoned state court decision. Id. at 635.  The last
11 reasoned state court decision here is the opinion of the California
12 Court of Appeal.

13

14    The California Court of Appeal denied Ground One on the merits, but
15 expressly declined to consider Petitioner's claim under the federal
16 Constitution "because he failed to raise that issue at trial."
17 (Lodgment G at 9 n.10).  Thus, the Court concludes that the California
18 Court of Appeal did not "adjudicate on the merits" Petitioner's
19 constitutional claim in Ground One.  Accordingly, AEDPA deference does
20 not apply and the Court will apply de novo review to Ground One.   See
21 Williams, 646 F.3d at 637.[3]

22

23    [2] Petitioner's petition for review is missing from the state court
   records lodged with the Court.  However, the parties appear to agree
24 that Petitioner raised all of his claims in his petition for review.
   Petitioner identifies the claims raised in his petition for review in
25 the instant Petition.  (See Petition at 3).   Respondent specifically
   acknowledges Petitioner's petition for review, (Answer Memo at 2), and
26 states that all of Petitioner's claims are exhausted, (Answer at 1),
27 which necessarily means that he raised them in his petition for review.

28    [3] The Court may only consider new evidence obtained through an
                                                        (continued...)

                                   11

1  Because the court of appeal imposed a procedural default on Ground
2  One, the adequate and independent state ground doctrine could
3  potentially bar federal review of this claim. See, e.g., Walker v.
4  Martin, __ U.S. __, 131 S. Ct. 1120, 1127, 179 L. Ed. 2d 62 (2011)
5  ("[A]bsent showings of 'cause' and 'prejudice,' federal habeas relief
6  will be unavailable when (1) a state court has declined to address a
7  prisoner's federal claims because the prisoner had failed to meet a
8  state procedural requirement, and (2) the state judgment rests on
9  independent and adequate state procedural grounds." (internal quotation
10 marks, citation, and brackets omitted)).  However, this Court has the
11 discretion to deny claims on the merits without reaching procedural
12 default issues where the outcome will be the same.  See Lambrix v.
13 Singletary, 520 U.S. 518, 525, 117 S. Ct. 1517, 137 L. Ed. 2d 771 (1997)
14 (holding that a district court may address the merits without reaching
15 procedural issues where the interests of judicial economy are best
16 served by doing so).  The Court exercises its discretion to deny Ground
17 One on the merits, under de novo review.

19 The California Court of Appeal denied Grounds Two and Three on the
20 merits and addressed the federal nature of Petitioner's claims by
21 analyzing "whether, on the entire record viewed in the light most
22 favorable to the People, any rational trier of fact could find
23 [Petitioner] guilty beyond a reasonable doubt." (Lodgment G at 6); (see

26 [3] (...continued)
evidentiary hearing if Petitioner satisfies 28 U.S.C. section
27 2254(e)(2).  See Cullen v. Pinholster, __ U.S. __, 131 S. Ct. 1388,
1401, 179 L. Ed. 2d 557 (2011).  The Court finds that there is no need
28 for an evidentiary hearing to resolve this claim.

12

1  also id. at 15) (concluding that "the jury reasonably could have found
2  that [Petitioner] harbored the necessary intent to assault the members
3  of the Bautista family."). This is the same sufficiency of the evidence
4  standard required by the federal Constitution. See Jackson v. Virginia,
5  443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979). Thus, the
6  Court concludes that the California Court of Appeal "adjudicated on the
7  merits" Petitioner's claims in Grounds Two and Three. Accordingly, the
8  deferential standard of review contained in section 2254(d)(1) and
9  (d)(2) applies. See Richter, 131 S. Ct. at 784.[4]

10
11                                  **VI.**
12                              **DISCUSSION**
13
14  **A.  Petitioner Is Not Entitled To Habeas Relief On His Claim That An**
15      **Expert Witness Improperly Testified Regarding The Ultimate**
16      **Question Of Petitioner's Guilt**

17
18      In Ground One, Petitioner contends that "[i]t was prejudicial
19  constitutional error for a gang expert to testify as to Petitioner's
20  guilt." (Petition at 5). Specifically, Petitioner argues that the
21  prosecution's gang expert, Detective Steven Skahill ("Detective
22  Skahill"), improperly "testified that Petitioner was guilty of the gang
23  enhancements. This opinion testimony violated Petitioner's Fourteenth

24  _____
25      [4]   The Supreme Court has held that "[i]f a claim has been
   adjudicated on the merits by a state court, a federal habeas petition
26  must overcome the limitation of § 2254(d)(1) on the record that was
   before that state court." Pinholster, 131 S. Ct. at 1400. Thus, the
27  Court cannot hold an evidentiary hearing on Petitioner's claims in
   Grounds Two or Three. Id. ("[E]vidence introduced in federal court has
28  no bearing on § 2254(d)(1) review.").

1   Amendment rights under clearly established high court precedent because
2   it undermined the jury's responsibility to find the ultimate facts
3   beyond a reasonable doubt." (Pet. Memo at 13). This claim fails under
4   de novo review.

5

6       **1.  Factual Background**

7

8       On June 28, 2006, the prosecution called Detective Skahill as a
9   witness. (RT 172, 210). Detective Skahill worked for over seventeen
10  years as a gang investigator for the Los Angeles County Sheriff's
11  Department. He was assigned to the sheriff's station near the location
12  of the shooting for approximately twenty years. (RT 209-10). According
13  to the detective, the area surrounding the location of Andrade's
14  shooting was claimed by the two Hispanic gangs: the Hurley Street gang
15  and the East Side Dukes. (RT 219-20, 223). Members of the Hurley
16  Street gang typically have self-identifying tattoos on their bodies.
17  (RT 220). Petitioner, whom the detective believed identifies with the
18  Hurley Street gang, has such a tattoo on his chest consisting of the
19  word "Hurley" as well as a tattoo bearing the letters "SGV" on his arm,
20  which stands for "San Gabriel Valley" in gang culture. (RT 224, 232).
21  Detective Skahill previously encountered Petitioner in September 2005
22  while investigating an incident in which Petitioner's black Mustang was
23  targeted in a gang-related shooting. (RT 225-27). In addition, various
24  field identification reports filed by sheriff's deputies identified
25  Petitioner as a Hurley Street gang member. (RT 230-33).

26

27      When asked whether he believed Andrade's shooting was committed for
28  the benefit of a criminal street gang, Detective Skahill opined that

Petitioner's conduct was "gang-related" because Petitioner had to "save face" upon being confronted by a neighborhood resident.  (RT 233-35). As explained by the detective:

> If you're out on the streets -- to side track -- if you're out -- if two gangs met out on the street and a challenge was issued, if you didn't return the challenge, you would be thought of a coward and your gang would be thought of as weak.  In this instance, even though the victim is not a gang member, he's a citizen and confronts a gang member, yells at him stop driving the car so fast.  That's a challenge.  He's threatened him.  Everybody sees this.
>
> So now, in order to save face for the gang and for himself, he has to do something, get some payback, retaliate. He comes back later on after the initial confrontation and shoots the victim.  That is saving face because in the gang culture and everything out there, everybody knows who does what.  They're really close and interspersed in that territory.  Word's going to get out, so and so from somewhere, he got fronted off by nobody and he didn't do nothing about it, so the gang will lose respect.

\\
\\
\\
\\
\\

15

1        If he does do something, the respect goes up.   His

2     respect goes up within the gang itself too because he did

3     something about it, he didn't coward down.   That's how it

4     becomes a gang incident.

5

6  (RT 235).

7

8     In Detective Skahill's opinion, a gang member would lose respect

9  in the gang if he failed to retaliate against an individual who yelled

10  at him for driving erratically.   (RT 235-36).   The detective testified

11  that fear and intimidation play prominent roles in establishing a gang's

12  dominance within a community.   (RT 237-39).   In particular, fear of

13  gangs often dissuades neighborhood residents from testifying against

14  gang members.   (RT 238-39).

15

16    **2.   Analysis**

17

18     Under California law, expert testimony on criminal street gangs is

19  admissible to prove the elements of the criminal street gang

20  enhancement.   See People v. Hernandez, 33 Cal. 4th 1040, 1047-48, 16

21  Cal. Rptr. 3d 880 (2004) ("In order to prove the elements of the

22  criminal street gang enhancement, the prosecution may, as in this case,

23  present expert testimony on criminal street gangs."). Additionally, "an

24  expert may render opinion testimony on the basis of facts given in a

25  hypothetical question that asks the expert to assume their truth."

26  People v. Gardeley, 14 Cal. 4th 605, 618, 59 Cal. Rptr. 2d 356 (1996)

27  (internal quotation marks omitted).

28

1    At the outset, it must be recognized that federal habeas courts "do
2   not review questions of state evidence law." Jammal v. Van de Kamp, 926
3   F.2d 918, 919 (9th Cir. 1991); see also Lewis v. Jeffers, 497 U.S. 764,
4   780, 110 S. Ct. 3092, 111 L. Ed. 2d 606 (1990). "[F]ailure to comply
5   with the state's rules of evidence is neither a necessary nor a
6   sufficient basis for granting habeas relief. While adherence to state
7   evidentiary rules suggests that the trial was conducted in a
8   procedurally fair manner, it is certainly possible to have a fair trial
9   even when state standards are violated." Jammal, 926 F.2d at 919.
10  Thus, the erroneous admission of gang expert testimony is not subject
11  to federal habeas review unless a specific constitutional guarantee is
12  violated or the error is of such magnitude that the result is a denial
13  of due process and the fundamental right to a fair trial. See Henry v.
14  Kernan, 197 F.3d 1021, 1031 (9th Cir. 1999). The admission of evidence
15  violates due process only where two circumstances are met: (1) "there
16  are no permissible inferences the jury may draw from the evidence"; and
17  (2) the evidence is "of such quality as necessarily prevents a fair
18  trial." Jammal, 926 F.2d at 920 (internal quotation marks omitted)
19  (emphasis in original).

20

21    Here, Detective Skahill's discussion of gang culture did not result
22  in a deprivation of Petitioner's right to due process or a fair trial.
23  Testimony from Detective Skahill, an experienced gang investigator, was
24  relevant to explain how a retaliatory act against an individual who
25  chose to confront a gang member within gang territory could benefit a
26  gang by furthering its reputation for ruthlessness. See United States
27  v. Hankey, 203 F.3d 1160, 1168-69 (9th Cir. 2000) (finding that a gang
28  expert's testimony was relevant based on his experience as a police

17

officer dealing with gangs and special knowledge of gang culture).  The detective's opinion that Petitioner's act of shooting Andrade was "a gang-related incident" provided the jury with a context of how street gangs operate within a community and how gangs rely on fear and intimidation to reinforce their dominance in a neighborhood.  (RT 233-37).

Utilizing Detective Skahill's testimony, the jury could draw a rational inference that Petitioner's decision to shoot Andrade was motivated not just by an unwarranted display of anger, but by Petitioner's desire to aid the Hurley Street gang and cement its reputation for ruthlessness.  See Windham v. Merkle, 163 F.3d 1092, 1103-04 (9th Cir. 1998) (finding no error in the admission of gang expert testimony where such evidence could establish a reasonable inference that the petitioner's crimes were motivated by an intent to retaliate against a rival gang).  Without the detective's testimony, the jury would have had no means to fully assess Petitioner's motivation for shooting Andrade and what Petitioner intended to accomplish by his actions.  See People v. Olguin, 31 Cal. App. 4th 1355, 1369, 37 Cal. Rptr. 2d 596 (1994) ("Evidence of gang activity and affiliation is admissible where it is relevant to issues of motive and intent . . . .");  People v. Funes, 23 Cal. App. 4th 1506, 1518, 28 Cal. Rptr. 2d 758 (1994) ("Cases have repeatedly held that it is proper to introduce evidence of gang affiliation and activity where such evidence is relevant to an issue of motive or intent.").  Because the jury could draw some permissive inferences from Detective Skahill's testimony, its admission did not render the trial proceedings fundamentally unfair.

18

1    As for Petitioner's claim that Detective Skahill improperly
2  testified to the ultimate question of Petitioner's guilt, the record
3  does not reflect the detective expressing such an opinion.   "Although
4  '[a] witness is not permitted to give a direct opinion about the
5  defendant's guilt or innocence . . . . an expert may otherwise testify
6  regarding even an ultimate issue to be resolved by the trier of fact.'"
7  Moses v. Payne, 543 F.3d 1090, 1106 (9th Cir. 2008) (as amended).   Here,
8  Detective Skahill never directly stated that Petitioner was guilty of
9  any specific crime or that the jury should find true the gang
10  enhancement allegation, nor did the detective discuss his view of
11  Petitioner's intent or mental state.   Rather, the detective opined that
12  based on his knowledge of gang culture and Petitioner's association with
13  the Hurley Street gang, Petitioner's retaliatory act against Andrade was
14  "gang-related."   This testimony was proper.   (RT 233-34).

15

16    Because the gang enhancement statute does not expressly require a
17  jury finding that Petitioner's crime was "gang-related," see Cal. Penal
18  Code § 186.22(b)(1) (requiring a finding that a crime was committed for
19  the benefit of any gang with the specific intent to promote, further,
20  or assist in any criminal conduct by gang members), Detective Skahill's
21  opinion did not convey to the jury how it should decide the elements of
22  the gang enhancement statute.   To the extent Detective Skahill's
23  testimony touched upon an ultimate issue, his opinion "is not
24  objectionable [simply] because it embraces the ultimate issue to be
25  decided by the trier of fact." Cal. Evid. Code § 805; see Fed. R. Evid.
26  704 (utilizing identical standard); see also Moses, 543 F.3d at 1105
27  (the admission of expert testimony concerning an ultimate issue to be
28  resolved by the trial of fact does not violate the Constitution); U.S.

1   v. Lockett, 919 F.2d 585, 590-1 (9th Cir. 1990) (an expert may testify
2   regarding an ultimate issue, without giving a direct opinion on guilt
3   or innocence).  Accordingly, Ground One fails under de novo review.

5   **B.    Petitioner Is Not Entitled To Habeas Relief On His Claims**
6   **Regarding Insufficient Evidence**

8        In Grounds Two and Three, Petitioner challenges the sufficiency of
9   the evidence to support his convictions.  Specifically, in Ground Two,
10  Petitioner contends that there was insufficient evidence to support the
11  jury's finding that his conduct was "intended to promote, further or
12  assist the Hurley Street gang when he shot Carlos Andrade besides the
13  conclusory and speculative assertions of Detective Skahill." (Pet. Memo
14  at 18).    In Ground Three, Petitioner contends that there was
15  insufficient evidence to support his four convictions for assaulting
16  each member of the Bautista family with a firearm.    (Petition at 6).
17  There is no merit to these claims.

19       A conviction based on insufficient evidence deprives a petitioner
20  of the right to due process under the Fourteenth Amendment.  Jackson,
21  443 U.S. at 317-18.   On habeas review, sufficiency of the evidence
22  claims must be assessed "'with explicit reference to the substantive
23  elements of the criminal offense as defined by state law.'" Chein v.
24  Shumsky, 373 F.3d 978, 983 (9th Cir. 2004).  To determine whether the
25  evidence is sufficient to uphold a criminal conviction, "the relevant
26  question is whether, after viewing the evidence in the light most
27  favorable to the prosecution, any rational trier of fact could have
28  found the essential elements of the crime beyond a reasonable doubt."

1 Jackson, 443 U.S. at 319 (emphasis in original).  "If confronted by a
2 record that supports conflicting inferences, federal habeas courts must
3 presume -- even if it does not affirmatively appear in the record --
4 that the trier of fact resolved any such conflicts in favor of the
5 prosecution, and must defer to that resolution.  A jury's credibility
6 determinations are therefore entitled to near-total deference under
7 Jackson."  Bruce, 376 F.3d at 957 (internal quotation marks and citation
8 omitted).

10   Accordingly, "the applicant is entitled to habeas corpus relief
11 [only] if it is found that upon the record evidence adduced at trial no
12 rational trier of fact could have found proof of guilt beyond a
13 reasonable doubt."  Jackson, 443 U.S. at 324.  Because this case falls
14 under AEDPA, the standard is even more deferential.  Under AEDPA, the
15 court must determine "whether the decision of the California Court of
16 Appeal reflected an 'unreasonable application of' Jackson and Winship
17 [In re Winship, 397 U.S. 358, 364, 90 S. Ct. 1068, 1070, 25 L. Ed. 2d
18 368 (1970)] to the facts of this case."  Juan H. v. Allen, 408 F.3d
19 1262, 1274-75 (9th Cir. 2005) (as amended).

21   **1.   Ground Two: Gang Enhancement**

23   The California Street Terrorism Enforcement and Prevention Act
24 ("STEP Act"), California Penal Code sections 186.20 et seq., is a
25 statutory scheme enacted to further the "eradication of criminal
26 activity by street gangs."  Cal. Penal Code § 186.21.  Pursuant to this
27 goal, the STEP Act contains a sentence enhancement in section
28 186.22(b)(1) if a person is convicted of certain gang-related crimes.

1 As explained by the Ninth Circuit, "Section 186.22(b)(1)'s gang
2 enhancement may only be applied if the prosecution proves the following
3 two elements beyond a reasonable doubt: (1) that [the petitioner]
4 committed a felony 'for the benefit of, at the direction of, or in
5 association with any criminal street gang,' and (2) that he did so 'with
6 the specific intent to promote, further, or assist in any criminal
7 conduct by gang members.'" Emery v. Clark, 643 F.3d 1210, 1214 (9th
8 Cir. 2011) (per curiam). "[T]o prove the elements of the criminal
9 street gang enhancement, the prosecution may . . . present expert
10 testimony on criminal street gangs." People v. Hernandez, 33 Cal. 4th
11 1040, 1047-48, 16 Cal. Rptr. 3d 880 (2004).

12

13      Although the prosecution need not prove that the petitioner
14 possessed a specific intent to "benefit" the gang, "[w]hat is required
15 is the specific intent to promote, further, or assist in any criminal
16 conduct by gang members." People v. Leon, 161 Cal. App. 4th 149, 163,
17 73 Cal. Rptr. 3d 786 (2008) (internal quotation marks omitted). To
18 sustain a jury's gang enhancement finding, "there must have been
19 evidence upon which a rational trier of fact could find that [the
20 petitioner] acted with the 'specific intent to promote, further, or
21 assist in' some type of 'criminal conduct by gang members,' which may
22 include the crimes of conviction." Emery, 643 F.3d at 1216 (emphasis
23 in original). According to the California Supreme Court, "the scienter
24 requirement in section 186.22(b)(1)--i.e., 'the specific intent to
25 promote, further, or assist in any criminal conduct by gang members'--is
26 unambiguous and applies to any criminal conduct, without a further
27 requirement that the conduct be 'apart from' the criminal conduct
28 underlying the offense of conviction sought to be enhanced." People v.

22

1  Albillar, 51 Cal. 4th 47, 66, 119 Cal. Rptr. 3d 415 (2010) (emphasis in
2  original).   Thus, "'[t]here is no statutory requirement that this
3  "criminal conduct by gang members" be distinct from the charged offense,
4  or that the evidence establish specific crimes the defendant intended
5  to assist his fellow gang members in committing.'"  Id. (quoting People
6  v. Vazquez, 178 Cal. App. 4th 347, 354, 100 Cal. Rptr. 3d 351 (2009)).[5]

8       On direct review, the California Court of Appeal concluded there
9  was sufficient evidence to sustain the jury's gang enhancement finding.
10  (Lodgment G at 6-8).   The appellate court acknowledged that it was
11  possible Petitioner's conduct "was intended to enhance his own personal
12  stature within the community . . . and not for the benefit of the Hurley
13  Street gang," but concluded the jury's finding to the contrary was not
14  unreasonable.   (Id. at 7).   In the court's view, the jury could
15  reasonably have found that Petitioner committed the crimes with the
16  specific intent to promote, further, or assist criminal conduct by the
17  Hurley Street gang based on evidence of Petitioner's association with
18  the gang, Petitioner's use of a "mad-dogging" stance directed at
19  Andrade, the fact that the shooting occurred in gang territory, and
20  Detective Skahill's opinion that "the crimes at issue were consistent

23       [5]   The Ninth Circuit previously held in Garcia v. Carey, 395 F.3d
24  1099 (9th Cir. 2005), and Briceno v. Scribner, 555 F.3d 1069 (9th Cir.
    2009), that "section 186.22's gang enhancement can only be applied when
25  the defendant had the specific intent to facilitate gang members'
    criminal activities other than the charged crime."  Emery, 643 F.3d at
26  1215  (emphasis in original).   This interpretation, however, was
    explicitly disapproved by the California Supreme Court in Albillar, 51
27  Cal. 4th at 64-66, and is no longer binding in this Circuit.  Emery, 643
28  F.3d at 1215 (recognizing "that the California Supreme Court has
    overruled Briceno and Garcia's interpretation of section 186.22(b)(1)").

1 with a typical gang's demand for respect on its turf and goal of
2 intimidating community members."  (Id. at 7-8).

4      This Court agrees with the court of appeal's determination that
5 there is sufficient evidence to support the jury's gang enhancement.
6 First, there is ample evidence that Petitioner committed his crimes "for
7 the benefit of" the Hurley Street gang, specifically to preserve the
8 gang's respect in the community and to exert the gang's dominance
9 through fear and intimidation. Cal. Penal Code § 186.22(b)(1).  Andrade
10 and Bautista identified Petitioner as a known Hurley Street gang member,
11 and he had tattoos indicating his association with the gang.  (RT 177,
12 185, 218, 224, 234).  Andrade, who lived in an area claimed by the
13 Hurley Street gang, told Petitioner to slow down his vehicle, but
14 Petitioner responded by staring at Andrade in an intimidating manner,
15 leaving the scene, and returning moments later with a gun.  (RT 116-17,
16 219-20, 223).  Petitioner then opened fire on Andrade, hitting him in
17 the back and nearly striking the Bautista family.  (RT 116-17, 138-40,
18 217).

20      According to Detective Skahill, gang members typically participate
21 in retaliatory acts against community members who affront them in order
22 to reinforce their respective street gang's reputation for ruthlessness
23 and to preserve the gang's respect.  (RT 233-36).  Viewed in this
24 context, Petitioner's act of shooting Andrade could reasonably be
25 interpreted as an attempt to intimidate residents and to elevate the
26 Hurley Street gang's status in the neighborhood, thereby conferring a
27 benefit on the gang.  See Albillar, 51 Cal. 4th at 63 ("Expert opinion
28 that particular criminal conduct benefitted a gang by enhancing its

24

1   reputation for viciousness can be sufficient to raise the inference that
2   the conduct was 'committed for the benefit of . . . a[] criminal street
3   gang' within the meaning of section 186.22(b)(1).")   While the jury
4   could have rejected Detective Skahill's interpretation of Petitioner's
5   conduct, it evidently found the detective's opinion believable.   Because
6   the record supports such a finding, the Court must accord deference to
7   the jury's findings.   Bruce, 376 F.3d at 957.

9        Second, there is also ample evidence that Petitioner committed his
10  crimes with the specific intent to "promote, further, or assist in any
11  criminal conduct by gang members."   Cal. Penal Code § 186.22(b)(1).   A
12  reasonable jury could infer that Petitioner's retaliation against
13  Andrade in front of neighborhood residents within the boundaries of
14  Hurley Street gang territory was intended to promote, further, or assist
15  the gang's criminal activities by intimidating neighborhood residents,
16  dissuading them from reporting gang crimes to the police, and
17  solidifying the gang's territorial control.   See Vazquez, 178 Cal. App.
18  4th at 353-54 (finding that a murder perceived as an act of intimidation
19  could facilitate a gang's commission of future crimes).

21       In challenging the sufficiency of the evidence, Petitioner relies
22  on Garcia v. Carey, 395 F.3d 1099 (9th Cir. 2005), in arguing there was
23  insufficient evidence of scienter, asserting that Detective Skahill's
24  expert testimony was "purely speculative" as to the question of
25  Petitioner's intent.   (Pet. Memo at 19-20).   However, the Ninth Circuit
26  has recognized that Garcia's interpretation of the scienter requirement
27  in California Penal Code section 186.22(b)(1) was incorrect.   Emery, 643
28  F.3d at 1215.   Thus, Petitioner's reliance on Garcia is misplaced.

1    Petitioner references the California Court of Appeal's observation
2    that it was "quite plausible [his] conduct was intended to enhance his
3    own personal stature within the community" as an indication that the
4    jury's gang enhancement finding was unreasonable.   (Pet. Memo at 20).
5    This Court disagrees.  Although it is "quite plausible" Petitioner shot
6    Andrade for the sole purpose of enhancing his own personal stature, it
7    is equally plausible he committed such a crime for the benefit of the
8    Hurley Street gang.   Consistent with the <u>Jackson</u> standard of reviewing
9    sufficiency of the evidence claims, the Court entertains the presumption
10   "that the trier of fact resolved any such conflicts in favor of the
11   prosecution, and must defer to that resolution."   <u>Bruce</u>, 376 F.3d at
12   957.

13

14   Petitioner also challenges the gang enhancement finding based on
15   his assertion that he was not an "active" member of the Hurley Street
16   gang.  (Pet. Memo at 20-21).  Regardless of Petitioner's actual status
17   within the Hurley Street gang, "[t]he enhancement set forth in section
18   186.22(b)(1) . . . does not depend on membership in a gang at all.
19   Rather, it applies when a defendant has personally committed a gang-
20   related felony with the specific intent to aid members of that gang."
21   <u>Albillar</u>, 51 Cal. 4th at 67-68.  Even assuming <u>arguendo</u> that Petitioner
22   was no longer an "active" Hurley Street gang member, that fact alone
23   would not negate a section 186.22(b)(1) gang enhancement.

24

25   Finally, Petitioner argues that his act of staring at Andrade in
26   an intimidating way (<u>i.e.</u>, "mad dogging") was not indicative of "a
27   typical gang's demand for respect."   (Pet. Memo at 21).   Contrary to
28   Petitioner's argument, the California Court of Appeal did not reference

1  Petitioner's "mad dogging" as evidence that Petitioner demanded respect
2  for his gang.  Rather, the appellate court noted his intimidating stare,
3  coupled with his other actions, could reasonably be perceived as an
4  attempt to frighten Andrade and to intimidate the neighborhood.
5  (Lodgment G at 7).  Thus, Petitioner's act of staring at Andrade was not
6  the sole basis for the jury's finding that he possessed the requisite
7  intent under California Penal Code section 186.22(b)(1).

8

9      In sum, the Court concludes that there is sufficient evidence to
10  support the jury's gang enhancement finding.  Habeas relief on
11  Petitioner's claim in Ground Two is unwarranted.  See 28 U.S.C. §
12  2254(d).

13

14      **2.   Ground Three: Assault With A Firearm**

15

16      "Any person who commits an assault upon the person of another with
17  a firearm shall be punished by imprisonment in the state prison . . .
18  ."  Cal. Penal Code § 245(a)(2).  An assault, in turn, is defined as "an
19  unlawful attempt, coupled with a present ability, to commit a violent
20  injury on the person of another."  Id. § 240.  Assault, being a general
21  intent crime, "does not require a specific intent to cause injury or a
22  subjective awareness of the risk that an injury might occur.  Rather,
23  assault only requires an intentional act and actual knowledge of those
24  facts sufficient to establish that the act by its nature will probably
25  and directly result in the application of physical force against
26  another."  People v. Williams, 26 Cal. 4th 779, 790, 111 Cal. Rptr. 2d
27  114 (2001).  "[A] defendant guilty of assault must be aware of the facts
28  that would lead a reasonable person to realize that a battery would

27

 1  directly, naturally and probably result from his conduct.  He may not
 2  be convicted based on facts he did not know but should have known.  He,
 3  however, need not be subjectively aware of the risk that a battery might
 4  occur."  Id. at 788.

 5

 6      Thus, in order to sustain a conviction for assault with a firearm,
 7  the record must show that "the defendant had actual knowledge his act,
 8  by its nature, would probably and directly result in physical force
 9  being applied on another person."  People v. Riva, 112 Cal. App. 4th
10  981, 997, 5 Cal. Rptr. 3d 649 (2003).  "Because the gravamen of assault
11  is the likelihood that the defendant's action will result in a violent
12  injury to another, it follows that a victim of assault is one for whom
13  such an injury was likely."  People v. Trujillo, 181 Cal. App. 4th 1344,
14  1355, 105 Cal. Rptr. 3d 316 (2010) (citation omitted).

15

16      On direct review, the California Court of Appeal concluded there
17  was sufficient evidence to support Petitioner's assault convictions.
18  The court, after stating the applicable law regarding an assailant's
19  knowledge, held,

20

21          A reasonable person would have realized if he fired at a
22      person standing with friends in front of a home in a
23      residential neighborhood early on a Friday evening, the
24      bullet could strike other pedestrians or residents, whether
25      or not those individuals were intended targets.  The jury was
26      presented with evidence the Bautistas' car had just driven
27      into the driveway adjacent to the yard where Andrade stood
28      when  [Petitioner]  fired,  and  there  was  no  evidence

                                  28

1    [Petitioner] did not see the car or its individual occupants.
2    Accordingly, the jury reasonably could have found that
3    [Petitioner] harbored the necessary intent to assault the
4    members of the Bautista family.

5

6  (Lodgment G at 15). As discussed below, the California Court of
7  Appeal's rejection of Petitioner's challenge to the sufficiency of the
8  evidence was not contrary to, or an unreasonable application of, clearly
9  established federal law, nor did it constitute an unreasonable
10 determination of the facts in light of the evidence presented.

11

12      In the present case, this Court concludes that, pursuant to
13 Jackson, 443 U.S. at 319, the evidence was sufficient to support
14 Petitioner's convictions for assaulting the Bautista family with a
15 firearm. On the night of the incident, Petitioner pointed a gun at
16 Andrade after Andrade yelled at him to slow down his vehicle. (RT 116-
17 17). At that moment, Bautista, Andrade's neighbor, had just arrived
18 home with his wife and two children and was stopped in his car in front
19 of his driveway. (RT 135-37). Bautista noticed Andrade standing on the
20 open sidewalk next door and greeted him, but Andrade did not respond.
21 (RT 136, 180). When Bautista's son exited the car to open the driveway
22 gate, Bautista heard a series of gunshots and saw muzzle flashes from
23 a gun. (RT 137-38). Bautista alerted his son, daughter, and wife to
24 get down, and his car and house were struck by bullets. (RT 137-38,
25 182). Although neither Bautista nor his family were injured, Andrade
26 was hit by a bullet. (RT 138, 140). From these facts, a rational juror
27 could find beyond a reasonable doubt that Petitioner (1) had the present
28 ability to commit a violent injury on Bautista and his family, (2)

1   attempted to do so with a firearm, and (3) had actual knowledge that his
2   act of firing a gun would probably and directly result in injuring
3   anyone caught within range of his gunshots. See Trujillo, 181 Cal. App.
4   4th at 1351, 1357 (upholding multiple assault convictions based on the
5   defendant's act of firing a firearm at a car despite his unawareness of
6   a passenger in the back seat); People v. Felix, 172 Cal. App. 4th 1618,
7   1628-30, 92 Cal. Rptr. 3d 239 (2009) (upholding multiple assault
8   convictions based on the defendant's actual knowledge that his act of
9   firing at a house could endanger the people inside). Because the record
10  supports a finding that Petitioner knew his intentional act of firing
11  a gun would (and did, in Andrade's case) result in injury, sufficient
12  evidence demonstrates Petitioner's intent to commit an assault on the
13  Bautista family.

14

15      Petitioner, however, claims the prosecution was required "to prove
16  that Petitioner was aware of the presence of the Bautistas," and he
17  argues the California Court of Appeal improperly required him to
18  disprove his awareness of the assault victims' presence. (Pet. Memo at
19  23). As illustrated above, the prosecution merely needed to prove that
20  Petitioner had actual knowledge his actions would probably result in
21  injury. Evidence of Petitioner's subjective awareness of the Bautista
22  family was unnecessary to sustain his assault convictions. Trujillo,
23  181 Cal. App. 4th at 1357 (holding that whether a defendant who shot at
24  a car was subjectively aware of unseen passengers was irrelevant).
25  Moreover, the Court notes that evidence of Petitioner's awareness of the
26  presence of the Bautistas or other people in the immediate range of his
27  gunfire could be inferred circumstantially based on the close distance
28  between Bautista's car and Andrade, the fact that Bautista's son was

1  outside the car trying to open the driveway gate, and Bautista's ability
2  to observe muzzle flashes from Petitioner's gun.  See People v. Bloom,
3  48 Cal. 3d 1194, 1208, 259 Cal. Rptr. 669 (1989) ("Evidence of a
4  defendant's state of mind is almost inevitably circumstantial, but
5  circumstantial evidence is as sufficient as direct evidence to support
6  a conviction.").   Furthermore, the California Court of Appeal's
7  observation that "there was no evidence [Petitioner] did not see the car
8  or its individual occupants" did not imply Petitioner bore the burden
9  of proving his knowledge of the Bautistas or lack thereof.   (Lodgment
10 G at 15).   Rather, the court, within the context of its assessment of
11 the sufficiency of the evidence, simply noted a deficiency in the
12 record, i.e., the absence of evidence supporting Petitioner's claim that
13 he was unaware of the Bautista family's presence.

15     In sum, the Court concludes that there is sufficient evidence to
16 support Petitioner's conviction for assault with a firearm.   Habeas
17 relief on Petitioner's claim in Ground Three is unwarranted.   See 28
18 U.S.C. § 2254(d).

## VII.
### RECOMMENDATION

     For the foregoing reasons, IT IS RECOMMENDED that the District
Court issue an Order: (1) accepting and adopting this Amended Report and
Recommendation; and (2) directing that Judgment be entered dismissing
this action with prejudice.

DATED: September 1, 2011                    /S/
                                     SUZANNE H. SEGAL
                                     UNITED STATES MAGISTRATE JUDGE

31

1

2                                  **NOTICE**

3

4       Reports and Recommendations are not appealable to the Court of

5  Appeals, but may be subject to the right of any party to file objections

6  as provided in the Local Rules Governing the Duties of Magistrate Judges

7  and review by the District Judge whose initials appear in the docket

8  number.  No notice of appeal pursuant to the Federal Rules of Appellate

9  Procedure should be filed until entry of the judgment of the District

10  Court.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

32